UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | |
|---|---|---|
| Stephen Montes Kerr | None | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |
| Attorneys Present for Plaintiff: | | Attorneys Present for Defendant: |
| None | | None |

**Proceedings:**     **(In Chambers)**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This memorandum constitutes the Court's findings of fact and conclusions of law following a bench trial held on October 9 through 11, 2013.

**I.
INTRODUCTION**

Freyr Holdings, LLC, ("Freyr") operated by principals Bill Lui and Richard Marshall, sues Legacy Life Advisors, LLC, and individuals Derek A. Siewert and William Hutchison (jointly "Defendants") for breach of contract and a common count for money had and received. Freyr contends that it was retained by Defendants to assist them: (1) in securing a potential investor contemplating investments in large face-value life insurance policies (referenced in this memorandum as "life settlements") and (2) thereafter obtaining and delivering such policies to Defendants for sale to the investor in exchange for an acquisition fee that Freyr and Defendants would share. After several months of work and due in significant part to Lui's efforts, Defendants secured a hedge fund, ITC Holdings, LLC ("ITC"), as a client that, over a relatively short time period, invested slightly more than $50 million in life settlements, which generated a fee in excess of $2.5 million that was paid to Defendants. Despite Freyr's work on behalf of Defendants over the period from July 2007 to late summer 2008, Defendants retained the entire acquisition fee and paid Freyr nothing. As part of a failed accord, Defendants paid Freyr $25,000, and then breached that agreement, which led to this lawsuit in which Freyr claims half of the acquisition fee ITC paid Defendants.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

After the presentation of evidence, the Court heard closing argument and received closing briefs from the parties.[1]  As discussed in greater detail below, the Court finds and concludes that the parties entered into an oral contract whose terms were both express and implied in fact. Although the parties exchanged competing written drafts that were apparently intended to memorialize and refine the details of their agreement, the agreement was never reduced to writing.  Nevertheless, the parties had reached agreement on the material terms of the contract, and Freyr provided the bargained-for services sought by Defendants who breached the agreement by failing to pay Freyr its portion of the sales fee.[2]  The Court will enter judgment in favor of Freyr and against the individual defendants; the Court will enter judgment in favor of Defendant Legacy Life Advisors, LLC, because it was not a party to the agreement.

**II.**
**DISCUSSION**

Because the Court's findings are bound up with the general principles of contract formation, the Court will begin with a brief discussion of those principles to put the factual discussion in an appropriate legal context.

**A. CONTRACT PRINCIPLES**

In first year contracts, one learns that a contract's scope, terms and conditions must be determined objectively through words, written and spoken, and actions taken.  The unspoken intentions of a party to a contract impose no obligation on any other party to the same agreement.   Thus, the law provides that a contract is formed only when and to the extent that "the parties all agree upon the same thing in the same sense."  Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 208 (Cal. App. 6th Dist. 2006); Cal. Civ. Code § 1580; see generally Banner Entertainment, Inc. v. Superior Court, 62 Cal. App. 4th 348, 357-358 (Cal. App. 2d Dist. 1998)

---

[1] The Court notes that Defendants have attempted to supplement the record with a request for judicial notice of a number of documents submitted with the post-closing briefs.  While the Court may take judicial notice of a number of the items identified by Defendants, it is under no obligation to do so.  The Court has given the parties ample opportunity to make their record in this case and will not further expand it through post-closing briefing.  Having reviewed the submission, the Court notes that even if it took judicial notice of the materials, nothing in them would change the result.

[2] The parties should note that these findings and conclusions are the product of extensive review of and reflection regarding the record created by the parties at trial.  Requests for further briefing and motions for reconsideration are discouraged in the strongest possible terms.  If an unhappy party feels that a review of the Court's ruling is appropriate, there is a forum available to the parties that exists for just that purpose.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

(citing Louis Lesser Enterprises, Ltd. v. Roeder, 209 Cal. App. 2d 401, 404–405 (Cal. App. 2d Dist. 1962); Apablasa v. Merritt & Co., 176 Cal. App. 2d 719, 730 (Cal. App. 2d Dist. 1959); Kessinger v. Organic Fertilizers, Inc., 151 Cal. App. 2d 741, 749–750 (Cal. App. 2d Dist. 1957).)

The subjective state of mind of either party to a contract has no bearing on the terms of a contract; rather it is the outward manifestation of consent from which the parties' intentions can be gathered that determines the scope and content of their agreement. Patel v. Liebermensch, 45 Cal.4th 344, 352 (2008); Brant v. Calif. Dairies, 4 Cal.2d 128, 133 (1935). "The mere state of mind of the parties is not the object of inquiry. The terms of the contract are determinable by an external, not by an internal standard—or by what has been termed the objective rather than the subjective test." Zurich etc. Assur. Co. v. Industrial Acc. Com. 132 Cal.App. 101, 104 (1933). The agreement must be determined through some combination of written or spoken words and conduct. 1 Witkin, SUMMARY OF CALIFORNIA LAW, Contracts § 117, at 156-57 (10th Ed. 2005).

The objective theory of contract is especially important in the Court's consideration of the evidence in this case. The Court's decision is based on its conclusion that the Defendants' claims regarding contract terms at most reflect their unstated subjective intent formed at some point during their relationship with Lui and Marshall and more probably amount to an after-the-fact effort to alter the deal. In either case, the objective evidence establishes that the parties reached an agreement that Freyr and its principals would assist Defendants for a 50% share of the ITC fee, that Freyr and its principals provided the requested assistance, and that Defendants failed to pay any portion of that fee for the services that were rendered. The following sets forth the details.

## B. CREDIBILITY

The Court takes the unusual step of addressing credibility issues at the outset because the only witnesses who testified were principals in the relevant transactions, all of whom have a substantial interest in the outcome of this case and who, on a number of critical issues, have offered irreconcilable versions of events. This has left the record muddied in many respects, which is an apt reflection of the way these parties conducted their business. The five men who testified at trial, despite their substantial education and business experience, never got around to documenting the terms of their business arrangement. Their effort to reduce their agreement to writing was a complete failure leaving the Court with competing drafts that widely differ in their terms and conditions. (Compare Exs. 4 and 10.) And yet there is no question that the parties reached some agreement and that Freyr performed under that agreement for nearly a year until the 2008 financial crisis and events in the field of life settlements caused the investments sold to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

ITC to lose substantial value.  In the embarrassing aftermath, the parties have spent the last three years in litigation pointing fingers at each other rather than pursuing a rational attempt at reaching a reasonable settlement.  The Court must now sort out the arguments and decide who should be believed.

In these circumstances, the Court has taken the following approach.  First, where possible, the Court has attempted to square the testimony of witnesses with the documentary record, such as it is, and to determine whether there was a reasonable explanation where the testimony varied from the documentary record.  In some cases the documentary record was helpful; in others not so much.  Second, the Court attempted to determine what testimony was reasonable and logical given the factual context in which the events occurred.  Through these means, the Court has generally concluded that Freyr's witnesses were more credible than the defense witnesses and presented a more cogent version of the relevant events.  Two aspects of the case were critical to this conclusion.

First, in assessing the probabilities associated with the conflicting stories regarding the terms and conditions of the parties' agreement, the evidence discussed below establishes that Defendants needed and sought out Plaintiffs to assist them in securing funding from an institutional investor with whom they had a connection.  (See, e.g., II.C.1. infra; Docket No. 114,1 R.T. 25..)[3]  The evidence was uncontradicted that Lui and Marshall, two principals in Freyr, had substantial experience and expertise in the field of life settlements in 2007, and that Defendants hoped to take advantage of that experience and expertise.  (II.C.1., infra.)  Defendants needed this expertise to realize the potential income to be generated if the investor could be persuaded to invest millions of dollars in life settlements.  (Id.; 1 R.T. 27.)  On the other hand, while Lui and Marshall were certainly happy to develop a relationship with another purchaser of life settlements, the uncontested evidence established that they already had several other sources purchasing life interests from them when Lui was approached by Hutchison and Siewert to promote Defendants' project.  (E.g., R.T. 134-35.)  Because Lui and Marshall were plainly in a superior bargaining position, Defendants' contention, for example, that Lui and Marshall would bear the obligation to purchase the policies for investment and retain the obligation to service the policies that were sold to ITC, while handing over half of Freyr's commission income generated on the transactions, is extremely unpersuasive.  In short, the relative bargaining positions of the parties undermines Defendants' assertions that Lui and

---

[3] The Court will use the following convention when citing to the Reporter's Transcript – the morning session of October 9 will be indicated as 1 R.T. __ (Docket No. 114); the afternoon session as 2 R.T. ___ (Docket No. 103); the morning session of October 10 as 3 R.T. ___ (Docket No. 115); and the afternoon session as 4 R.T. ___ (Docket No. 104) .

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

Marshall made substantial concessions to participate in an endeavor that might not have generated any business at all.

Second, where documentation exists, it generally supports the version of events described by Lui and Marshall. For example, there is very little question that, when Defendants' failed to share with Freyr the acquisition fee payments received in the first quarter of 2008, a dispute arose that was resolved through an accord reached in April 2008. Defendants now dispute that such an agreement was reached even though the accord is referenced in a number of documents. (E.g., Exs. 27-29; 32, 34-36, 37, 39.) The documents at least implicitly acknowledge that an agreement was reached (e.g., Exs. 32, 37), and Defendants cannot deny that a payment of $25,000 was made to Freyr toward that obligation. (E.g., Ex. 39.) When a party testifies to facts directly contrary to unimpeachable contrary evidence, his testimony is not entitled to much weight.

Although less blatant, Defendants claimed that at a meeting in New York, Lui reviewed and approved their December 2007 draft agreement that, among other things, allegedly contained provisions that Freyr share its commissions with Defendants and undertake detailed servicing of all policies sold to ITC. (3 R.T. 18-22.) Lui agreed that he met Defendants in New York in or about December 2007, but flatly denied that any such agreement was presented. (4 R.T. 131-32.) Lui's testimony is consistent with the documentary record, which contains no reference to Defendants' draft of an agreement with Freyr until after the agreement with ITC was signed. Siewert emailed Lui on January 7, 2008, indicating that the draft agreement between Defendants and Freyr was being prepared and that "Adam should have the draft for you tomorrow." (Ex. 6.) The draft was not delivered until January 9, 2008, at which time Lui forwarded it to Erik Nord, who was an attorney. (Ex. 4.) It is therefore clear that Defendants' draft of an agreement with Freyr was not concluded until the agreement with ITC was documented. Thus, to the extent that any document was being drafted in early to mid-December, it was in all likelihood the agreement between Defendants and ITC. (Ex. 5.) In short, the Court finds that Lui did not review a contract with Defendants in December because it did not exist at that time. This is discussed further below.

Finally, the Court briefly notes that, considering the demeanor and manner of the witnesses who testified, Lui impressed the Court as the most credible. Lui presented himself as a consummate professional who gave his best recollection of the events of 2007 and 2008. What the Court observed is consistent with Defendant Siewert who, in an email in which he was introducing a third party to Bill Lui, wrote: "I have known Bill for over a year now. He is very honest and has a great business sense. We are working with him as he is sourcing 100% of the product we are purchasing." (Ex. 14.) Marshall was credible with respect to the operation of his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

end of the business, but he was not present at any meetings before March 2008 and therefore had nothing to say regarding contract formation.  The defense witnesses were less impressive.

In short, where the parties present directly opposing versions of the facts and there is nothing in the record on the specific issue to assist in resolving the conflict, the Court has given greater weight to the testimony of Lui and Marshall over that presented by the defense witnesses.

C. THE TRANSACTIONS

1. *The Initial Negotiation*

In the 2005-06 time period, Bill Lui, who later became a principal in Freyr Holdings LLC, worked at Plainfield Asset Management ("Plainfield") where he was engaged in management consulting and hedge fund investing with a specialty in life settlements – the investment in life insurance policies purchased from the policy holder.  (1 R.T. 17-18.) Through his work at Plainfield, Lui met Hutchison and Alberti, who were involved in a venture attempting to purchase a hospital on Long Island.  (1 R.T. 21-22.)  Although that project apparently never got off the ground, Hutchison and Alberti learned of Lui's expertise in the life settlement field. (Id. 22-23)[4]

In late spring or early summer of 2007, Siewert, a friend of Hutchison's, had contact with an unnamed investor who was interested in the possibility of making multi-million dollar investments in life settlements.  (4 R.T. 13.)  Hutchison and Alberti then contacted Lui to begin discussions with him about the possibility of assisting them in the promotion of life settlement interests to an unnamed potential investor.  (Id. 23-24, 26-28.)  At about that time, Hutchison and Alberti brought Siewert into their discussions and arranged to meet with Lui in Connecticut in approximately June 2007.  (Id. 25.)  Neither Hutchison nor Siewert, who both had some experience in the insurance industry, had experience in the promotion of investments in life settlement interests and therefore sought out Lui because of his expertise in managing this specific type of investment program. (Id. 26-27.)

---

[4] Hutchison acknowledged Lui's expertise in life settlements.  (4 R.T. 8.)  Hutchison described Lui as an "expert in life settlements, has a pretty significant background in that.  He had a pretty important job in that area at Plainfield."  (Id.)  Hutchison also conceded that he had no real experience in the field of life settlements when they were pursuing a business arrangement with Lui and that, although Alberti was an experienced trustee, he too had little experience in the field.  (4 R.T. 12.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|----------|---------------------|------|------------------|

| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al |
|-------|--------------------------------------------------------|

As a result of these meetings, Lui, Hutchison, Siewert and Alberti in or about July 2007 reached an understanding that Hutchison and Siewert, with Lui's assistance, would continue in their effort to secure the investor as a funding source, and if successful, would use Lui to analyze and supply Defendants with policies to be sold to the funding source; Lui's work would include an assessment of the value of policies based on a number of factors such as age, health status, amount and duration of premium payments, and the like. (Id. 29, 42.) Defendants would have the right to conduct their own evaluation of the policies supplied by Lui and had the right to reject policies that were presented to them. (2. R.T. 18.) Alberti would act as the trustee of the trusts that owned the insurance policies. (Id. 44.)

Lui made the financial term of the agreement clear: because the details of Defendants' agreement with the investor had not yet been worked out, he advised Hutchison and Siewert that he would do the deal for 50% of what they made from the investor. (Id. 31, 34.)[5] Hutchison and Siewert agreed and accepted that proposal. (Id. 31.) Based on these conversations, Lui understood that Hutchison, Siewert and Alberti would have a direct contractual relationship with the investor, that they would receive payment of the entire fee, that they would account for the fees earned and would pay 50% of those fees to Lui, which Lui described as a standard arrangement in the industry. (Id. 33-34, 56.) Each party would bear its own expenses. (3 R.T. 38-39; 4 R.T. 72-73.) Based on what Defendants told him and his experience in the industry, Lui understood that he was entering into an agreement with Hutchison, Siewert and Alberti and whatever entity they formed in connection with the transaction. (Id. 34, 59; 2 R.T. 108.)

The parties spent the remainder of 2007 working on their project. (Id. 28-29, 97-98.)[6] During that period, Lui spent 10 to 15 hours a week on the project and ultimately developed a portfolio of policies that he received from Richard Marshall. (Id. at 37.) After evaluating the policies, Lui delivered Siewert and Hutchison a portfolio containing approximately 76 life policies that were available for purchase. (Id. 35; Ex. 83.) By August 17, 2007, Siewert, who

---

[5] Lui further explained on cross-examination that he couldn't be more specific because, even though he would be doing a lot of work for Defendants, at the time he agreed to assist Defendants he had no idea how they would be paid. (2 R.T. 104-05.) Without such information, it was not possible to agree to anything other than a 50/50 split of revenues generated from any deal ultimately struck with the then-unnamed investor. (Id.) Lui also noted that, if he were doing the deal on his own through his own funding sources, he would received 100% of all such fees. (1 R.T. 31.)

[6] Defendants attempted to impeach Lui with his declaration of December 9, 2010, (Docket No. 1-2) which, Defendants asserted, showed that the agreement was not reached until November 2007. (Ex. 114; 1 R.T. 101-104.) However, the declaration focuses on the agreement that the parties to this case reached with ITC, not the agreement they reached among themselves. (1 R.T. 104-05.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

was in possession of the portfolio, notified Lui that he had a potential investor, and sought additional information regarding the policies concerning mortality table ratings, premiums paid, date of issuance and life expectancies. (1 R.T. 37; Ex. 83.)

### 2. *Lui Merges JCE With Freyr*

When Lui first became involved with Defendants, he and Marshall were not partners and each had his own company: Lui operated through JCE Advisors and developed relationships with investors who had money to purchase policies; Marshall operated through Freyr to acquire interests in life policies principally through his connections to insurance agents. (E.g., 1 R.T. 40-42; 2 R.T. 97-98.) At that time, Marshall earned his compensation principally from the sharing of sales commissions with insurance agents and policy holders who were selling their policies.[7] (Id. at 99.) Because Marshall had access to life settlement policies being offered for investment, Lui contacted him after he had reached his agreement with Defendants to obtain policies to be reviewed by Defendants for potential purchase. (1 R.T. 39.)

Marshall and Lui did not discuss how Marshall would be compensated because Marshall got his money on the seller side and expected no compensation from Lui. (2 R.T. 100.) However, because of the complementary nature of their businesses, they had determined by November 2007 to merge their companies. (2. R.T. 100.) The merger was formally concluded in November 2007. (Id. 41-42.) Given that none of the Defendants performed any services relating to the aggregation of life policies for investment, neither Marshall nor Freyr ever agreed to share with Defendants the commission income that Marshall generated as an aggregator. (Id. at 100-01.) In fact, Marshall had no contact with any of the Defendants or Bill Birchfield until March 2008 after ITC commenced purchasing policies that were supplied through Marshall's efforts. (Id. at 101.)

---

[7] Where the policy was newly issued with commissions still due the insurance agent, the agent would pay people like Marshall a portion of the commissions as an aggregator's fee for Marshall's efforts at re-selling the policy in the secondary market. (2 R.T. 98-99.) Marshall explained that the sharing of commissions occurred only where the policy was relatively new because commissions are normally paid on first year premiums. (2. R.T. 103.) The sale of a relatively new policy is called a "wet" deal because the ink isn't "dry." A "dry" deal involves a policy that is over two years old where there is no commission to share. In those cases, Marshall's only fee would in fact come from the buyer's side. (Id. at 103-04.) ITC was involved primarily in "wet" deals, so the transactions typically generated a commission sharing arrangement between Marshall and the insurance agent who sold the policy. (Id. at 104.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

### 3.  ITC Is Revealed as the Funding Source

Some time in November or December 2007, Defendants disclosed the potential investor to be ITC, which was a fund connected with Ergon Capital, and identified Bill Birchfield as the representative of the fund who appeared to be the individual with final authority over the investment decision.[8]  (E.g., 1 R.T. 48; 3 R.T. 40-41; 4 R.T. 11.)  Birchfield had asked to meet with Defendants primarily to have them introduce Lui to discuss the "business plan" and the "production."  (3 R.T. 41.)  Lui was asked to participate because he was the man who could provide the assurances that Birchfield sought to commit to the investment.  (3 R.T. 41; 1 R.T. 49.)  At the meeting, Birchfield acknowledged that he was in active negotiations with Hutchison and the others regarding a deal to invest in life settlements.  (Id. 50.)  Alberti explained:

> One of his issues . . . was if Ergon committed the funds that we were discussing with them at that level, could we actually put those to work?  Where was the production going to come from?  I think he was doing his due diligence.  He wanted to see all of us in the room and *he wanted to see the person that was going to provide a significant source of potential inventory for the fund to invest in.*

(3 R.T. 41.)  (Emphasis added.)  Birchfield thoroughly questioned Lui regarding the details of life settlement investments.  (Id. 49.)

Birchfield provided no details of his negotiations with Defendants and made no commitment at the meeting but did indicate in general terms that the proposal contemplated that Hutchison's group would receive front end and back end compensation.  (Id. 51-52.)  The parties discussed Lui's role – that he would find, evaluate and negotiate the acquisition of the life policies to be sold to Birchfield's fund.  (Id. 52.)  When compensation was discussed, Lui made a concession – that Freyr would not make a profit on the sale of policies that it purchased and then re-sold to ITC, that is, that there would be no "spread" or difference between Lui's purchase

---

[8] The parties do not agree on the location or the timing of the meeting.  Lui recalls that the meeting was arranged by Siewert, was attended by Hutchison, Siewert, Alberti, Lui and Birchfield, and took place in Manhattan.  (1 R.T. 49-50.)  Alberti recalled that the meeting took place in Florida.  (3 R.T. 41.)  Both indicated that the meeting took place in November or December of 2007.  (Id.)  The record contains no means of determining where the meeting took place, or whether there may have been two meetings before ITC determined to engage Defendants to supply it with life settlements for investment.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

price and the price paid by ITC. (Id. 94-95.)[9]  There was no discussion regarding commissions that Freyr would make on the sale of life policies to the insureds. (Id. 96-97.)[10]

### 4.  Defendants Reach Agreement With ITC

As a result of that meeting, Hutchison, Siewert and Alberti were able to conclude their negotiations with Birchfield.  On January 3, 2008, they entered into a written agreement called the Portfolio Origination and Liquidation Services Agreement ("POLSA").  (Ex. 5.)  The agreement is notable because, although the Defendants and Alberti insisted in their testimony that they would never have agreed to act as co-obligors on a contract with Freyr, and Hutchison insisted that "I very rarely, if ever, do anything personally," (4 R.T. 16), the POLSA included Derek A. Siewert, Andrew A. Alberti, and William Hutchison in addition to Legacy Life Advisors NA, LLC, as parties to the agreement.  (Ex. 5.)

The Agreement provided generally that ITC would pay an up front portfolio acquisition fee of .5% of the face value of policies acquired, and a portfolio disposition fee of 50% of any profit earned on the subsequent sale of those policies.  (Id. at 3.)  On January 9, 2008,  Siewert delivered a copy of the POLSA to Lui, Marshall, and Erik Nord, an attorney who was affiliated with them.  (Ex. 7; 1 R.T. 59.)  This solidified the prior agreement between Lui and Defendants and obligated them to pay Freyr half of the acquisition fee earned through the sale of life settlements to ITC.

### 5.  ITC Commences Purchases of Life Settlements

Although Freyr and Defendants had not yet reduced their agreement to writing, the parties commenced working together to sell life settlements to ITC in early January 2008.  (E.g., 3 R.T. 54; 4 R.T. 23; Ex. 73.)  ITC provided funding, and Lui and Marshall provided Legacy with policies to be sold to ITC.  (1 R.T. 89-90.)  Thereafter, the parties became heavily involved in the day to day work associated with the sale of life settlements to ITC.  (Id. 121.)  Over this period, Freyr provided substantial services to Defendants and supplied them with a flow of inventory to be sold to ITC.

_____

[9] Lui explained that the net spread on the entire series of transactions was zero, but that there was some variation from transaction to transaction because Freyr had not obligated itself to suffer a loss on any sale and was in fact in a loss position on a small number of deals.  (1 R.T. 94-96.)

[10] Lui noted that, prior to the merger with Marshall, his company did not earn commissions because it was not involved in the marketing of life policies to insureds.  (1 R.T. 97.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

### 6. *Freyr and Defendants Work Without A Written Agreement*

On January 9, 2008, the same date that Defendants provided Freyr with a copy of the POLSA, they delivered a draft agreement to Lui for his review. (Ex. 4, 6, 7; 1 R.T. 120-21.) Lui noted a number of terms to which there had been no agreement and contacted Siewert to ask that the document be revised. (1 R.T. 121.) Siewert indicated that changes would be made, but Defendants never provided Freyr with a revised draft. (Id. 121-22.)

In the meantime, the parties worked assiduously to supply ITC with life settlements for which ITC paid .5% of the face value as an acquisition fee for the services received from Defendants and Freyr. (E.g., Ex. 74.) Although Defendants were collecting the fee and Freyr was supplying product, Freyr received no payments from Defendants. (1 R.T. 68.) In short, although Lui and Marshall had provided Hutchison and Siewert with policies that were in fact sold to ITC and generated fee income, they had received no compensation from Hutchison, Siewert or any entity with whom they were involved. (1 R.T. 69.) The only income they had received was from commission payments associated with sellers of the life policies. (Id.) When no revisions to the agreement were forthcoming from Defendants, Erik Nord, an attorney involved with Freyr, re-wrote the agreement and sent a copy to Defendants in late March 2008. (Ex. 10.)

### 7. *The March Meeting with ITC*

In March 2008, the parties met twice in Long Beach, California. Hutchison and Siewert attended the first meeting with Lui and Marshall; at the second meeting Alberti and Birchfield also attended. (1 R.T. 64.) It was during these meetings that Marshall first met the Defendants and Birchfield. (2 R.T. 101.) The meetings were conducted so that Birchfield could conduct further due diligence on behalf of ITC to determine whether to make additional investments. (Id. 65; 101-02.) ITC was prepared to put additional funds into life settlements and wanted to assure themselves that Lui and Marshall could handle the additional volume. (Id. 67, 101-02.)[11] Birchfield came away from the meeting suitably impressed as ITC continued to purchase life

---

[11] The California meeting was an opportunity for Birchfield to see the Freyr staff, which consisted of 20 highly compensated professionals, in action. (2 R.T. 110-11.) The staff included four teams, each headed by a managing analyst, that reviewed approximately 400 policies a week for possible purchase. (2 R.T. 110-111.) Approximately 10% of them "priced" and about 150 to 200 actually sold. (Id..) Every week Freyr would pay out between $3 million and $8 million to acquire policies; the figure on Exhibit 74 showing beneficial interest payments reflected reimbursement to the seller for the price paid for the policies. (Ex. 74; 2 R.T. 112.) On the ITC deal, Freyr received no "spread," that is, no profit on the sale. (2 R.T. 112-13.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|----------|---------------------|------|------------------|

| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al |
|-------|---------------------------------------------------------|

settlements.  (E.g., Exs. 13, 74.)

In the meantime, Freyr continued to press for the completion of a written agreement between the parties.  On March 28, 2008, Lui e-mailed Siewert emphasizing the need to complete the process, (Ex. 17), and on March 30, Nord sent to Alberti, Siewert, Hutchison, Lui and Marshall a markup of a draft agreement and seeking a time to discuss the agreement in the near future.  (Ex. 10.)   The revised agreement included Alberti, Hutchison and Siewert, as co-obligors along with their LLC, eliminated the language granting Defendants any claim to Freyr's commissions earned from its work as an aggregator, and deleted any language purporting to impose on Freyr a continuing obligation to service the policies.  (Id.)  It more accurately described Freyr's obligation as the identification and presentation of products to Legacy for purchase by ITC and its affiliates.  (Id.)  The second draft also slightly altered the fee structure by limiting Freyr's right to compensation to ITC's first $50,000,000 in investments under the POLSA. (Id.)

When several days had passed after the revised agreement was forwarded to Defendants, Lui wrote to Marshall and Nord stating that, "[b]efore the Freyr-Legacy contract is finalized," he wished to clarify with Defendants "that Freyr and Legacy have a[n] oral agreement that Legacy will give Freyr 50% of the back end profit Legacy receives from ITC based on the ITC-Legacy contract" and "that Freyr and Legacy are not going to negotiate this 50% of the back end profit when we negotiate the rest of the Freyr-Legacy contract."  (Trial Ex. 19.)[12]  Nord contacted Defendants noting that they had his draft under review and to confirm the parties' understanding with respect to the back-end profit split.  (Ex. 20.)  Alberti wrote back the following day to confirm that they were reviewing the revised agreement, that Defendants had in fact agreed to a 50/50 split of the back-end profit, and to express the hope that a final agreement could be completed by May.  (Ex. 21.)

What happened thereafter is unclear except that no agreement was ever signed.  In the meantime, the parties continued to do business; ITC committed an additional $15 million to the investment "and 15% of any new capital that comes in."  (Ex. 13.)  Even so, as noted above, despite ITC's purchases through March and its intention to continue with further purchases of life settlements, Freyr had received no part of the acquisition fee.

---

[12] The Court is aware that Defendants seize on language such as that found in this exhibit as evidence that supports their contention that Freyr agreed to contract only with a Legacy entity.  Given that the correspondence references a draft that indicates otherwise, the argument is illogical.  The language is plainly short hand to refer to the parties on the other side of the deal, and reflects nothing more than Lui's understanding that a Legacy entity would be *one of* the contracting parties.  (See Ex. 10.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

## D. DEFENDANTS' BREACH AND THE RESULTING ACCORD

### 1. *The April 30, 2008 Accord*

Because Defendants were clearly receiving payments on the sale of life settlements to ITC, Freyr continued to press Defendants for payment of their share without success.  (1 R.T. 70-71.)  Freyr was threatening to cease working for Defendants until the payment issue was resolved, and finally demanded a meeting to resolve the dispute.[13]  (Id.)  The parties agreed to meet in Rye, New York, on April 30, 2008.  (2 R.T. 52-53; Ex. 23, 25.)

By all accounts the meeting was contentious.  (E.g., 1 R.T. 70-71; 3 R.T. 29.)  Because Defendants had received well over a million dollars in fees and had failed to remit any part of those fees to Freyr or its principals, Lui and Marshall indicated that they were going to withdraw from the arrangement unless they received payment.  (1 R.T. 71.)  Hutchison walked out of the meeting because, he now claims, he was upset over Freyr's refusal to share its commissions with him and his partners.  (See 2 R.T. 53-55; 4 R.T. 29-30.)  From Hutchison's perspective, Lui and Marshall were changing the deal terms and "dictating" things like how much salary he was going make.  (Id. 31-32.)[14]  There is little doubt that the salaries were discussed because Lui and Marshall wanted to know what had happened to the acquisition fee, and Defendants were attempting to explain how it had been used.  (1 R.T. 71.)[15]  Siewert attempted to justify the retention of the entire fee because of the expenses that Defendants were incurring – legal fees, travel and office expenses, and a finder's fee that was due to a middleman.  (Id. 71-72.)[16]

_____

[13] Despite the parties inability to agree on most things, there is one thing that, before this trial, no one seemed to dispute: that Freyr was to receive half of the acquisition fee paid by ITC.  (1 R.T. 30-31 [Lui agreed to participate for "50 percent of everything you make"]; 3 R.T. 37 [Alberti]; 4 R.T. 15 [Hutchison]; 4 R.T. 72-73 [Siewert].  However, at trial defense counsel suggested in the cross-examination of Marshall that Defendants had not obligated themselves to pay Freyr anything.  (2 R.T. 53.)

[14] At this stage of these legal proceedings, the parties have a dispute over the substance of the dispute at that meeting.  Lui's best recollection is that Hutchison felt that Freyr was not entitled to any portion of the ITC commission payments.  (2 R.T. 53-54.)  Defendants contend that they were angry because they believed that, if they were to share their commission from ITC, the Freyr parties should receive half of the commissions that the Freyr policies shared with the agents who sold the life policies to the insureds.  (E.g., 4 R.T. 29-30.)

[15] Alberti confirmed that Hutchison became very angry early in the meeting, "said that he wasn't going to be dictated to what his company was going to pay him and he stormed out of the meeting . . . ."  (3 R.T. 61.)

[16] Indeed, a significant fact not previously disclosed to Lui or anyone else at Freyr was that Defendants had obligated themselves to pay and in fact paid a finder's fee to Mark Chambers between $800,000 and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|----------|---------------------|------|------------------|

| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al |
|-------|--------------------------------------------------------|

However, as noted above, Defendants' position was contrary to the agreement that each party would bear its own expenses. (3 R.T. 38-39; 4 R.T. 72-73.) Nevertheless, Freyr agreed to a substantial reduction in its fee from Defendants – specifically that in return for a forthwith payment of $480,000, Freyr would continue to assist Defendants in the selection and purchase of life settlements to be sold to ITC. (1 R.T. 72-74; 3 R.T. 32.)

### 2. *The Accord Is Not Satisfied*

Defendants and Alberti testified that no agreement was reached at that time, but this testimony is not credible. First, Defendants needed Freyr because it was their only source of life settlements to be sold to ITC. The evidence shows that Defendants had sold 35-40 life settlements to ITC by this time, (4 R.T. 30), received over a million dollars in fees at this point, and because Freyr was providing all of the policies being sold to ITC (Ex. 14), the ITC income stream would dry up overnight without Freyr's participation. Given that Freyr continued to assist Defendants in the selection and purchase of life settlements after the meeting, (1 R.T. 72-74; Ex. 74), it is not believable that Freyr would continue to perform without some understanding regarding payment of its fee, especially when Freyr had other funding sources to whom they could sell life settlement interests, including Plainfield. (1 R.T. 69.) Second, although the agreement was not contemporaneously documented, it was extensively discussed in correspondence between the parties later in 2008, (e.g., Exs. 27, 28, 29, 32, 34, 35, 36, 37, 39), and a partial payment of $25,000 was made in November 2008. (Ex. 35.) Siewert's email to Erik Nord and Bill Lui in November 2008 acknowledges the debt and complains that Freyr is now asking for more money than Defendants had agreed to pay. (Ex. 37.)

Further discussions took place, but no resolution was reached; in sum Freyr received only the single $25,000 payment from Defendants for the services it rendered from January 2008 to September 2008. Accordingly, while Freyr offered Defendants a means of satisfying their obligation with a payment of less than the amount due, Defendants ultimately failed to pay and there was therefore no satisfaction of the Defendants' obligation to Freyr.

### E. DAMAGES

Defendants argue that, under any set of circumstances, Freyr suffered no damages because there was never an agreement to share the acquisition fee. (Docket No. 108, at 4-8, 12.)

---

$900,000. (4 R.T. 91-92.) In short, based on an assumed $50,000,000 investment, Defendants had committed approximately 33% of the acquisition fee to this undisclosed third party.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

The Court rejects that contention based on the discussion above.

Alternatively, Defendants contend that the parties at most agreed to share "gross profits," which involved a calculation that permitted Defendants to deduct at least some of their expenses from the amount due Freyr under the agreement. Under this theory, the maximum potential award would be $552,500, or half of the acquisition fee after a reduction of more than $1.4 million. (Id. at 12.)

The argument that Freyr's share of the acquisition fee can be reduced by the amount of any expenses that Defendants incurred contradicts the testimony of every witness who testified; even the defense witnesses agreed that all parties understood that each party would bear its own expenses associated with the project. (E.g., 3 R.T. 38-39; 4 R.T. 72-73.) A contrary arrangement would not make business sense because Freyr had no control over how Defendants managed their business and controlled their expenses. By requiring that each side bear its own costs and expenses, Freyr was also protected against Defendants' failure to disclose obligations that were not readily apparent on the face of the transaction. In fact, Defendants did conceal a critical fact – that they had committed to paying a finder's fee that amounted to over $800,000 to Mark Chambers. (See Section II.D.1. & n. 16 supra.) That payment alone seriously compromised Defendants ability to both manage their business effectively and realize substantial income to themselves as a result of the deal. Defendants method of dealing with this problem was to retain all income received from ITC, pay themselves substantial sums of money, and pay Freyr nothing. Thus, when Defendants met with Freyr on April 30, 2008, they attempted to justify their actions by reciting all of the expenses that they had incurred. (See Section II.D.1. supra.) Even then, Freyr offered them a chance to resolve the dispute for a much reduced fee, but, as discussed in Section III.A. infra, when Defendants breached their obligation to pay even that reduced amount, Freyr was free to pursue its claims under its agreement with Defendants.

The actual computation of damages is very straightforward. Freyr is entitled to half of the acquisition fee ITC paid Defendants without reduction for any expenses incurred by Defendants and subject to the statute of limitations discussion below. In computing this figure, the Court has examined Exhibits 74, 76, 77 and 85. Based on these documents the Court concludes that the total acquisition fee paid by ITC was $2,748,700. This figure is most easily derived by taking the ITC spreadsheet in Exhibit 77, which, as of June 5, 2008, shows a total fee paid to Defendants of $2,383,750. To that figure, the Court has added the sum of $265,000, derived from the Legacy Life Advisors NA, LLC, bank statement showing receipt on June 17, 2008 of transfers from ITC totaling $265,000. Accordingly, the Court finds that Freyr is entitled to recover from Defendants $1,374,350.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

**F. TERMS NOT INCLUDED IN THE AGREEMENT**

The parties plainly reached an agreement and performed under that agreement. However, there are several terms that Defendants now claim were part of the agreement that Freyr disputes. As set forth below, the Court finds that none of these terms were included in the agreement reached by the parties.

Legacy As The Sole Contracting Party – Defendants contend that Lui, Marshall and Nord always knew that they operated through Legacy and that Legacy would, therefore, be the sole contracting entity on their consulting agreement. There is no doubt that Freyr's principals were, at least by January 2008, aware that Defendants had formed Legacy and were doing business through Legacy. (2 R.T. 108.) That fact, however, does not mean that Lui and Marshall were prepared or had ever agreed to accept Legacy as the sole obligor on any agreement between them.

Lui testified that he had never agreed to such an arrangement and that it was contrary to the way business is done in his field. (1 R.T. 34, 58-59.) Lui's testimony is corroborated by the POLSA that ITC negotiated with Legacy, which includes Siewert, Hutchison and Alberti as individual contracting parties. (Ex. 5; see also Ex. 78.) Moreover, at the time the parties were working through the basic outline of their consulting arrangement, the Defendants had virtually no experience in the field of life settlements, they had no track record, they had no office, they had no employees, they had not firmed up any agreement with any funding source, and their LLC had no assets of any kind. (E.g., 1 R.T. 42-44.) As noted in the discussion above, Lui, on the other hand, was a respected, established expert in the field of life settlements. The assertion that Lui was prepared to undertake a substantial effort to secure an investor for Defendants and to accept as the sole contracting party a shell corporation without employees, an office, clients or any other assets defies business reality. Which leads directly to the next issue.

Legacy Life Advisors, LLC Was Not A Party – This is not to say that a Legacy entity was not intended to be one of the contracting parties. Freyr's draft of the agreement (Ex. 10) acknowledges that one of the contracting parties would be the entity just as it was on the POLSA. (See Ex. 5.) However, Freyr's draft identifies the entity as Legacy Life Advisors NA, LLC, a Delaware Limited Liability Company, as the contracting entity. Accordingly, the complaint in this case has named the wrong entity. Judgment must therefore be entered in favor of the entity sued in this case. However, because Freyr's agreement was with Defendants and whatever entity they decided to use as their operating vehicle, the presence of the entity is not necessary to the entry of judgment in this case.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

<u>Freyr Did Not Agree to Split Sales Commissions with Defendants</u> – As the discussion above indicates, Lui testified persuasively, and Defendants do not deny, that Defendants approached him to assist in closing a deal with an undisclosed funding source. Lui testified credibly that, after some discussion, he and Defendants agreed that he would lend his expertise to their effort in exchange for half of what Defendants would make from the funding source. The Defendants were not in a position to bargain with Lui and made no attempt to do so. And the history of the transaction bears out the importance of Lui to the transaction – ITC did not close with Defendants until Birchfield met with Lui, who persuaded Birchfield that he could deliver the investment product that ITC wanted; and Birchfield only made a second round of investments after coming to California to view Freyr's operation which was sufficiently impressive to generate additional funding from ITC.

The timing of Lui's negotiations with Defendants also demonstrates that Defendants struck their deal with him at a time when his business had no involvement in the aggregation of life settlements and therefore had no commission income. Lui clearly had no authority at that time to bargain away any of the income generated from Marshall's aggregation of life settlements to be sold. Moreover, after Lui and Marshall later merged their businesses, there was no occasion when Lui, who had already commenced working on behalf of Defendants, purported to negotiate away any fees generated on the aggregation side of Freyr's business. Defendants' later effort to claim a portion of the income generated by Marshall's activities was nothing if not audacious. Defendants had nothing to offer Marshall and did nothing to assist him – Marshall located and purchased the policies that were delivered to Defendants for re-sale to ITC without any assistance from anyone at Legacy. Finally, despite Defendants' inclusion of Freyr's commission payments in its definition of the adjusted gross profits to be shared by the parties (Ex. 4), there is not a single additional reference to any such obligation in any document in this record, including those documents exchanged regarding the dispute over Freyr's right to half of the acquisition fee ITC paid to Defendants. It is incomprehensible that, if Defendants believed they were entitled to half of the commission payments, they would not have mentioned that fact in their exchanges with Freyr in the dispute over the split of the ITC acquisition fee. In short, taking all of these facts into account, the Court finds Lui's testimony that the parties agreed to share 50/50 any fees earned by Defendants on the ITC deal to be credible, and finds Defendants claims to a share of Freyr's commission income to be not credible.

<u>Defendants Are Not Entitled to an Offset</u> – Defendants have suggested that Freyr is not entitled to any portion of the ITC acquisition fee because their claim should be offset by income earned on commissions made through the aggregation of policies. The above discussion resolves this issue. Because Defendants were never entitled to any portion of Freyr's income

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

from the aggregation of policies to be sold to ITC, Defendants cannot claim that any portion of those payments should be offset against any amounts due from them.

      <u>Freyr Did Not Agree to Service the Policies</u> – The dispute over the "servicing" obligation persuades the Court that the term was never defined, that the respective duties of the parties were never clearly spelled out, and therefore that there was never a meeting of the minds between the parties regarding their duties with respect to policies sold to ITC.

      On one hand, Alberti testified that "Bill Lui and/or Freyr was to be the servicing entities [sic]," (3 R.T. 38), although he did not testify what "servicing" entailed. Having offered that conclusion, Alberti also conceded that, as trustee, he was retained "to do certain administration for a set monthly fee" to be paid by Defendants. (Id. 43-45.)[17]  Hutchison also acknowledged that Alberti was involved in the servicing functions associated with the acquisition of the life settlement interests, but conceded that he never really knew exactly what roles each person played. (4 R.T. 46-47.)  Hutchison was aware only that Alberti and Lui were coordinating their efforts to effectuate the conveyance of the beneficial interests into trusts over which Alberti acted as trustee. (Id., see also 3 R.T. 15-17 (Alberti confirming principal contact with Lui)). Hutchison also acknowledged that, under the POLSA (Ex. 5), Alberti had a "maintenance function" associated with keeping the policies in force. (4 R.T. 48-49.)  What Alberti and Hutchison describe is consistent with Lui's testimony.  Lui explained that Freyr could not have serviced the interests sold to ITC because, once those policies were transferred to a trust for the benefit of ITC, Alberti as trustee was the legal owner of the interests for the benefit of ITC and Freyr had no legal authority with respect to the policies. (1 R.T. 46-47, 130-31.)  This is no doubt correct as basic trust law holds that the trustee holds legal title of the trust asset for the trust beneficiary. Cal. Prob. Code §§ 15200 et seq.   In practice, there is little doubt that aspects of "servicing" was performed both by Defendants and by Freyr, (e.g., 2 R.T. 74-75, 91 ), that it was the subject of ongoing discussion between the parties (e.g., 2. R.T. 48-51), but Hutchison said it best when he testified "exactly what the definition of 'servicing' is, I don't know." (4 R.T. 48.)  The only thing that is now clear is that the parties never reached an understanding as to what was even encompassed by servicing let alone reach an agreement allocating servicing responsibility.

      <u>Freyr Did Not Breach the Agreement</u> – Based on the foregoing discussion, the record before the Court establishes that Freyr performed each of its obligations under the contract.  Its

---

      [17] Alberti's suggestion that he had no significant role in the servicing of the policies is not credible; he acknowledged receiving $480,000 for his services as trustee. (3 R.T. 49-50.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

performance assisted Defendants in securing ITC as an investor through which Defendants generated over $2.5 million in acquisition fees from the sale of life settlements.  Nothing presented at trial or in the closing briefs offers any persuasive evidence, argument or authority to the contrary.  Moreover, as noted above, the parties reached no agreement regarding servicing obligations so nothing Freyr did could constitute a breach of any such obligation.  Rather, in an ad hoc fashion, they each performed some obligations that might fall within the definition of servicing.  Moreover, the suggestion that Freyr's conduct in this regard constituted a breach of the covenant of good faith and fair dealing ignores the fact that, without any obligations, Freyr took steps to insure that Defendants were in a position to service the policies and even took steps to keep policies from lapsing when Freyr had no contractual obligation to do so.  (See, e.g., Exs. 30, 60, 69, 108; 2 R.T. 89.)  Moreover, no evidence was presented that any lapsed policy could not and was not reinstated and, more significantly, no evidence was presented of any loss suffered as a result of a policy lapse.

With respect to the assertion that Freyr breached the so-called "settlement agreement," Defendants are directed to Section III. below where the Court discusses the doctrine of accord and satisfaction.

**III.**
**LEGAL ISSUES**

The case is largely fact driven.  However, the Court notes several legal issues that require some discussion.

**A. ACCORD AND SATISFACTION**

As noted above, the parties engaged in an effort to reach an accord that would compromise Freyr's claim to half of the acquisition fee.  The Court briefly addresses the controlling legal principles that operate in this context.

California Civil Code § 1521 provides that "[a]n accord is an agreement to accept, in extinction of an obligation, something different from or less than that to which the person agreeing to accept is entitled."  If the consideration of the accord is tendered as required by the accord and is accepted by the obligee, the acceptance is called a satisfaction and extinguishes the underlying obligation.  Cal. Civ. Code § 1523.  Where parties reach an accord, the initial obligation remains in effect until the obligation under the accord has been performed.  See

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|----------|---------------------|------|------------------|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

Moving Picture Machine Ops. Union v. Glasgow Theaters, 6 Cal.App.3d 395, 403 (1970).  Until then, the creditor may seek recovery under the original obligation.  Id. at 404.

Here, the parties negotiated an accord, and had Defendants performed as agreed, they could have resolved this case long ago for a substantial reduction in their obligation to pay Freyr 50% of the acquisition fee.  However, except for a single payment of $25,000 in or about November 2008, they breached their obligations under the accord.  This left Freyr free to pursue their original claim to its 50% interest in the acquisition fee.  Accordingly, Defendants cannot set up an accord and satisfaction as a defense to Freyr's claims.

## B. STATUTE OF LIMITATIONS

Defendants raise the statute of limitations as a defense to the claims brought against them.  In addressing the application of the defense, the Court has in mind its underlying public policy:

> Civil statutes of limitations protect defendants from the necessity of defending stale claims and require plaintiffs to pursue their claims diligently. [Citations.] They are " 'designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.' "[Citations.]

Romano v. Rockwell Int'l, Inc., 14 Cal. 4th 479, 488 (1996).  The case law cited by the parties can best be understood with this policy in mind.

Defendants contend that, when they breached the agreement commencing with the receipt of commission payments in February 2008, the cause of action as to the entire contract accrued triggering the two year statute of limitations on an oral contract.  They argue that, because the payments under the agreement were "not severable," the statute ran from the date of first breach and Freyr therefore can recover nothing.  Boon Rawd Trading Int'l Co. v. Paleewong Trading Co., 688 F. Supp. 2d 940 (N.D. Cal. 2010).  Alternatively, they contend that the statute of limitations ran on any payments that were due and unpaid prior to April 27, 2008 – two years before suit was filed on April 27, 2010 .  CDF Firefighters v. Maldonado, 200 Cal. App. 4th 158 (2011).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

Defendants have failed to persuade the Court that the statute on the entire contract commenced to run in February 2008. Boon Rawd was not a case based on an obligation to make payments, which could have been accomplished at any time, but rather a breach of an agreement that Defendant-counterclaimant would operate as the exclusive distributor of Singha beer and other products in the United States. The issue before the court was whether the counterclaimant could avail itself of the delayed discovery rule when it alleged in its counterclaim that it was aware of the breach during negotiations with counterdefendant more than two years before filing suit. The district court held that the breach was complete when the right to exclusivity was violated and that the cause of action accrued at that time. 688 F. Supp. 2d at 948-49. The obligation here is different because the amount due and owing changed as more work was done. There is nothing in the case to suggest that a cause of action on an unpaid obligation accrues before the obligation to make payment arises. This is consistent with the principle that a cause of action for breach of contract cannot accrue before the time of the breach. Romano, 14 Cal. 4th at 488. The closer question is whether the claim accrued with respect to Freyr's right to a portion of the acquisition fee paid prior to April 27, 2008.[18]

Freyr relies on Romano for the proposition that, where the parties are engaged in an ongoing obligation, the plaintiff may elect to rely on the contract and await performance from the defaulting party. 14 Cal. 4th at 489. This is because the failure to perform in the past may be viewed as an anticipatory repudiation of the agreement, which the aggrieved party need not immediately pursue. The Romano court noted, "whether the breach is anticipatory or not, when there are ongoing contractual obligations the plaintiff may elect to rely on the contract despite a breach, and the statute of limitations does not begin to run until the plaintiff has elected to treat the breach as terminating the contract." Id. Thus, in Romano the California Supreme Court held that, even though defendant announced that it was terminating plaintiff two and a half years before the actual termination, the cause of action did not accrue until plaintiff was terminated. The context provides little guidance in this case. The Court therefore looks to other similar decisions.

In Lambert v. Commonwealth Land Title Ins. Co., 53 Cal.3d 1072, 1078 (1991), plaintiff sued a title insurance company for refusing to defend and indemnify him in a lawsuit brought by an adjoining property owner who claimed an easement over plaintiff's land. The lawsuit was filed after judgment was entered in plaintiff's favor in the easement dispute and more than two

---

[18] CDF Firefighters, however, is of no help on this issue. That case held that, for statute of limitations purposes, two different disciplinary proceedings instigated by union members at different times gave rise to two distinct causes of action even though both were governed by the same agreement. 200 Cal. App. 4th at 164-65.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

years after the denial of coverage.  The Court held that the statute of limitations had not run because the insurer's duties under the policy were continuing duties therefore that "[i]t is equitable and consistent with the legislative intent to toll the limitations period in which this duty continues from the date of accrual of a cause of action to final judgment."  See also <u>Union Sugar Co. v. Hollister Estate Co.</u>, 3 Cal.2d 740, 746 (1935) (aggrieved party need not bring suit upon first breach but may await completion of all performance when contract is continuing).

In the Court's view, the statute of limitations either did not start to run until after April 27, 2008 or was equitably tolled until some time after that date.  Here the parties were working together toward a common goal despite the fact that they had not reduced their agreement to writing and, by April 30, 2008, had serious disagreements regarding Defendants' failure to remit any part of the acquisition fee to Freyr.  They met to discuss this and Freyr received sufficient assurances to keep it involved in the project.  Indeed, through late 2008, Defendants reiterated that they knew they owed Freyr money and assured Lui and others that they were taking steps to meet those obligations.   In these circumstances, Freyr was justified in electing not to declare a breach, cease performing and file suit.  Thus, under <u>Romano</u>, <u>Lambert</u> and <u>Union Sugar</u> the breach did not accrue until the late fall of 2008, which is well within the statute of limitations period.

Alternatively, the discussion of equitable tolling in <u>Lambert</u> and in <u>Lewis v. Superior Court</u>, 175 Cal. App. 3d 366, 372-74 (1985) favors application of that doctrine in this case.  The policy behind the statute of limitations, as noted above, is to protect defendants from the potential prejudice that results from having to defend against stale claims.  The policy behind equitable tolling protects a plaintiff from the potential prejudice that flows from circumstances that delay the presentation of claims.  Here there was no substantial delay in the presentation of the claims, and the delay in Freyr's recognition of Defendants' breach was the result of extensive effort to work out a mutually acceptable arrangement with the Defendants.  Defendants' assurances that the accord to which the parties agreed was acceptable was plainly misleading.  In these circumstances, the application of the statute of limitations would be inequitable.

**C. STATUTE OF FRAUDS**

Defendants mention the statute of frauds as a defense to enforcement of the agreement.  The argument is not entitled to great weight.  First, the defense applies to an agreement that, "by its terms is not to be performed within a year from the making thereof."  Cal. Civ. Code § 1624(a)(1).  Where performance is possible within a year, even if it is unlikely, the statute does not apply.  <u>E.g.</u>, <u>Hollywood Motion Picture Equip. Co. v. Furer</u>, 16 Cal. 2d 184, 187 (1940).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

Because performance here was possible within a year, the statute of frauds does not apply. Moreover, where the oral agreement has been performed, the statute of frauds cannot be used as a defense to a breach of contract action. E.g., Dallman Co. v. Southern Heater Co., 262 Cal. App. 2d 582, 588 (1968) (statute of frauds not applicable to fully executed oral agreement); Tobola v. Wholey, 75 Cal. App. 2d 351, 357 (1946) (oral promise of half interest in ranch in exchange for management of property enforced where plaintiff managed property for 12 years). Here contract performance commenced in early 2008 and concluded no later than the fall of 2008. This is a second reason why the statute of frauds is not a defense in this case.

**D.  MONEY HAD AND RECEIVED**

The claim for money had and received provides an alternate basis for recovery. In Rutherford Holdings, LLC v. Plaza Del Rey, 2014 WL 255537 *4 (App. Ct., Jan. 23, 2014), the court of appeal wrote:

> In an action on an express contract, a claim for money had and received is permitted where there has been a total failure of consideration. [Citation.] "'Failure of consideration is the failure to execute a promise, the performance of which has been exchanged for performance by the other party.' " [Citation.] "[T]he failure of the consideration is total ... [where] nothing of value has been received under the contract by the party" seeking restitution. [Citation.] Where the failure of the consideration is total, "the law implies a promise on the part of the other to repay what has been received by him under the contract." [Citation.] Such a promise is implied because the "defendant cannot in equity and good conscience retain the benefits of the agreement and repudiate its burdens." [Citation.]

See also Brown v. Grimes, 192 Cal. App. 4th 265, 281 (2011). As another court stated, "This common count is available in a great variety of situations (4 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 561, pp. 688–690) and 'lies wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter.' [Citation.]" Gutierrez v. Girardi, 194 Cal. App. 4th 925, 937 (2011).

This case easily fits within this common count. The parties reached an agreement regarding the sharing of the acquisition fee earned on the sale of life settlements to ITC. ITC paid that fee to Defendants who held half of that fee for the benefit of Freyr and its principals and should be paid to them.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-9446 GAF (Ex) | Date | January 24, 2014 |
|---|---|---|---|
| Title | Freyr Holdings, LLC v. Legacy Life Advisors, LLC et al | | |

**IV.**
**CONCLUSION**

For the foregoing reasons, the Court finds for Freyr and against individual defendants Derek Siewert and William Hutchison.  Based on the testimony of all witnesses, the Court easily concludes that the parties entered into a relatively simple and straightforward agreement, that Freyr performed under that agreement, and that Defendants failed to pay Freyr for the services it rendered.  That the parties failed to reduce the agreement to writing or to set forth every detail of the agreement does not change the fact that both sides, through their behavior, acknowledged the existence of their agreement over the period of performance.  Defendants cannot now avoid the consequences of their failure to perform.

Plaintiff is to prepare and submit a proposed judgment consistent with these findings and conclusions.

**IT IS SO ORDERED.**